**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11    AVERY M. DARBEY,                          No. C 09-1571 SBA (PR)

12              Petitioner,                     **ORDER DENYING PETITION**
                                                **FOR WRIT OF HABEAS CORPUS**
13       v.                                     **AND DENYING CERTIFICATE**
                                                **OF APPEALABILITY**
14    JAMES WALKER, Warden,

15              Respondent.
      _____/

16

17    AVERY M. DARBEY,                          No. C 09-1572 SBA (PR)

18              Petitioner,                     **ORDER DENYING PETITION**
                                                **FOR WRIT OF HABEAS CORPUS**
19       v.                                     **AND DENYING CERTIFICATE**
                                                **OF APPEALABILITY**
20    JAMES WALKER, Warden,

21              Respondent.

22    _____/

23

24

25

26

27

28

**INTRODUCTION**

In August 2005, Petitioner was convicted following a jury trial in the Santa Clara County Superior Court of committing first degree residential robbery, and in a separate trial, of committing the crimes of carjacking and robbery. Petitioner filed separate federal habeas petitions attacking each judgment. The Court issued orders to show cause why the petition should not be granted in both cases. Respondent has filed answers to the petitions and Petitioner has filed a traverse in each case. Because the cases involve some common questions of law and fact, both petitions are addressed in this combined ruling. For the reasons discussed below, the petitions are DENIED as to all claims.

**DISCUSSION**

**I.     Standard of Review for State Court Decisions**

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court has "adjudicated" a Petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the Petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits. Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004). It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court. See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

**A.     Section 2254(d)(1)**

Challenges to purely legal questions resolved by a state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision

**United States District Court**
For the Northern District of California

that was "contrary to" or "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Williams v. Taylor, 529 U.S. 362, 402-04, 409 (2000). While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a Petitioner's allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

### 1.    Clearly Established Federal Law

"Clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "[Section] 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003). If there is no Supreme Court precedent that controls on the legal issue raised by a Petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law. See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court. Williams, 529 U.S. at 391. There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." Andrade, 538 U.S. at 64-65. When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework. See id. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.),

3

**United States District Court**
For the Northern District of California

1    cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000).

2              **2.      "Contrary To"**

3           "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

4    arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

5    the state court decides a case differently than [the Supreme] Court has on a set of materially

6    indistinguishable facts." Williams, 529 U.S. at 412-13.  A "run-of-the-mill state-court decision"

7    that correctly identifies the controlling Supreme Court framework and applies it to the facts of a

8    prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."

9    Williams, 529 U.S. at 406.  Such a case should be analyzed under the "unreasonable application"

10   prong of § 2254(d).  See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

11             **3.      "Unreasonable Application"**

12          "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

13   the state court identifies the correct governing legal principle from [the Supreme] Court's

14   decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams,

15   529 U.S. at 413.  "[A] federal habeas court may not issue the writ simply because that court

16   concludes in its independent judgment that the relevant state-court decision applied clearly

17   established federal law erroneously or incorrectly.  Rather, that application must also be

18   unreasonable." Id. at 411; accord Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam)

19   (challenge to state court's application of governing federal law must be not only erroneous, but

20   objectively unreasonable); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam)

21   ("unreasonable" application of law is not equivalent to "incorrect" application of law).

22          Evaluating whether a rule application was unreasonable requires considering the relevant

23   rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it

24   is more general, the state courts have more leeway.  Yarborough v. Alvarado, 541 U.S. 652, 664

25   (2004).  Whether the state court's decision was unreasonable must be assessed in light of the

26   record that court had before it.  Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

27          The objectively unreasonable standard is not a clear error standard.  Andrade, 538 U.S. at

28   75-76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69

1   (acknowledging the overruling of <u>Van Tran</u> on this point).  After <u>Andrade</u>,

2       [t]he writ may not issue simply because, in our determination, a state court's
        application of federal law was erroneous, clearly or otherwise.  While the
3       "objectively unreasonable" standard is not self-explanatory, at a minimum it
        denotes a greater degree of deference to the state courts than [the Ninth Circuit]
4       ha[s] previously a afforded them.

5   <u>Id.</u>  In examining whether the state court decision was unreasonable, the inquiry may require

6   analysis of the state court's method as well as its result.  <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1054

7   (9th Cir. 2003).

8       **B.**      **Sections 2254(d)(2), 2254(e)(1)**

9       A federal habeas court may grant a writ if it concludes a state court's adjudication of a

10  claim "resulted in a decision that was based on an unreasonable determination of the facts in

11  light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  An

12  unreasonable determination of the facts occurs where a state court fails to consider and weigh

13  highly probative, relevant evidence, central to a Petitioner's claim, that was properly presented

14  and made part of the state court record.   <u>Taylor v. Maddox</u>, 366 F.3d 992, 1005 (9th Cir. 2004).

15  A district court must presume correct any determination of a factual issue made by a state court

16  unless a Petitioner rebuts the presumption of correctness by clear and convincing evidence.  28

17  U.S.C. § 2254(e)(1).

18      Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding process, or

19  situations in which the Petitioner challenges a state court's fact-findings based entirely on the

20  state court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or

21  evidence presented for the first time in federal court.  <u>See</u> <u>Taylor</u>, 366 F.3d at 999-1000.  In

22  <u>Taylor</u>, the Ninth Circuit established a two-part analysis under §§ 2254(d)(2) and 2254(e)(1).  <u>Id.</u>

23  First, federal courts must undertake an "intrinsic review" of a state court's fact-finding process

24  under the "unreasonable determination" clause of § 2254(d)(2).  <u>Id.</u> at 1000.  The intrinsic

25  review requires federal courts to examine the state court's fact-finding process, not its findings.

26  <u>Id.</u>

27      Once a state court's fact-finding process survives this intrinsic review, the second part of

28  the analysis begins by dressing the state court finding in a presumption of correctness under

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

§ 2254(e)(1).  Id.  According to the AEDPA, this presumption means that the state court's fact-finding may be overturned based on new evidence presented by a Petitioner for the first time in federal court only if such new evidence amounts to clear and convincing proof a state court finding is in error.  See 28 U.S.C. § 2254(e)(1).  "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)." Taylor, 366 F.3d at 1000.

When there is no reasoned opinion from the highest state court to consider the Petitioner's claims, the Court looks to the last reasoned opinion.  See Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  Here, the California Court of Appeal was the highest state court to issue an explained opinion in both of Petitioner's cases.  See People v. Darbey, No. H029353, 2006 WL 3824820 (Cal. App. 6th Dist. Dec. 28, 2006).

**II.     Exhaustion**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through state collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c); Granberry v. Greer, 481 U.S. 129, 133-34 (1987).  The parties do not dispute that Petitioner has exhausted his claims in both cases.  The Court, therefore, considers Petitioner's claims on the merits.

## CASE NUMBER C 09-1572 SBA (PR) – CARJACKING

**I.     Background**

On August 5, 2005, a jury convicted the Petitioner and Edwin Beloney of carjacking (see Cal. Penal Code § 215) and second degree robbery (see Cal. Penal Code § § 211, 212.5(c)), and found true the allegations as to both defendants that the offenses were committed for the benefit of a criminal street gang (see Cal. Penal Code 186.22(b)).  (Ex. F at 10.)  Petitioner was sentenced to an indeterminate term of fifteen years to life for the carjacking, to run consecutively

to a determinate term of thirteen years for the robbery.  (Id. at 11.)  The sentence was to run concurrently with the sentence in the residential robbery case, which is the subject of case number 09-1571 SBA (PR), discussed below.  (See id.)

Defendants appealed.  Petitioner raised the following grounds for reversal:

> On appeal Darbey contends that (1) the evidence was insufficient to support the criminal street gang enhancement; (2) the prosecutor prejudicially misstated the law in argument; (3) the court prejudicially erred by refusing to admonish the jury that the hearsay the gang expert relied on as a basis for her opinions was not admitted for its truth; (4) the court should have instructed the jury that a crime is committed in association with a criminal street gang when there is a relationship between the crime and the gang; and (5) counsel rendered ineffective assistance by waiving objection to admission of evidence and/or failing to request proper instructions. Beloney contends that the court prejudicially erred in admitting evidence of a home invasion robbery that occurred the day after the carjacking incident. Beloney joins in Darbey's contentions (1), (2) and (4). We disagree with all these contentions, and therefore affirm the judgments.

(Resp't Ex. F. at 2.)  The court of appeal rejected these claims and affirmed.  (Id. at 2.)

On April 11, 2007, the California Supreme Court denied review.  (Resp't Ex. H.)

Petitioner filed a state habeas petition in superior court on May 30, 2006.  (Resp't Ex. I.) The petition was denied on July 21, 2008.  (Resp't Ex. J.)   Petitioner then sought relief in the Court of Appeal on August 5, 2008.  (Resp't Ex. K.)  The court denied the petition on August 15, 2008.  (Resp't Ex. L.)  On September 16, 2008, Petitioner filed a petition in the California Supreme Court,  (Resp't Ex. M), which denied the petition on March 11, 2009.  (Resp't Ex. N.)

The federal habeas petition in the carjacking case was filed in this Court on April 9, 2009. Respondent agrees that the petition is timely.  The Court issued an Order to Show Cause why the writ should not be granted on October 22, 2009.  Respondent filed an answer on May 11, 2010, accompanied by a memorandum of points and authorities, and lodged the record with the court. Petitioner filed a traverse on September 15, 2010, and a Memorandum in Support of the Traverse on the same day.  On January 14, 2011, Respondent filed a letter brief alerting the Court to a recent decision from the California Supreme Court, People v. Albillar, 51 Cal.4th 47 (2010), relating to the gang enhancement issues.

## II.    Statement of Facts

The following facts are taken from the opinion of the California Court of Appeal:

7

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Around 10:50 p.m. on March 21, 2004, Kiflom Hailu and Fadel Seck were standing in the parking lot of Seck's apartment complex on Loma Verde Way in San Jose, smoking. Hailu had started his silver Subaru Impressa, so the keys were in the ignition and the engine was running. Some young men drove by in an SUV. Two Black men approached them and asked for a cigarette. Hailu gave them one. The men then approached Hailu's car and one of them got on a cell phone. Hailu heard the man on the phone say, "'Is this the car?'" "'Are these the niggers?'" "'If these are the niggers, then we are going to blow them.'" Hailu thought that the men were going to shoot them, so he was afraid.

The second man put on some gloves. The first man went through Hailu's and Seck's pockets and then the second man did the same thing. The men took Hailu's cell phone and wallet and a photocopy of Seck's passport. After the men took the baseball cap from Seck's head they took Hailu and Seck behind a wall. The first man told Hailu and Seck to get down on their knees, and they did. The first man told the second man to get the "heat." The second man left, then came back and just stood there. The first man left, then came back with a third man that Hailu could hear but not see. The first man said, " 'I'm going to take your car and show it to my brother. If this is the car that he saw, then, you know, you guys are dead. If it's not, then we are going to leave it there.' " The third man then drove off with Hailu's Subaru. The first two men waited for a few minutes and then left.

Hailu never saw a gun or any other weapon that evening and he did not hear any of the men make any reference to gang membership. He did not get his car back for over a month. When the police found the car a few days after the incident, it was in good condition but the stereo system was missing. Hailu testified that he has never been in any gang, and that he does not know whether Seck has been. He could not identify either defendant at trial.

Ryan Goetz arrived at the apartment of his friend Thomas Hall around 10:00 p.m. on March 21, 2004. Defendants, who lived in the same apartment complex, were outside in the carport. Goetz knew defendants through Hall. Hall and Goetz knew that Beloney was a member of the Seven Trees gang because they had seen his gang tattoos, and Goetz testified that Hall and others had told him that Darbey is also a member of the gang. Neither Goetz nor Hall is a member of that gang or any gang. Goetz talked to defendants for a few minutes in the carport then went to see Hall. Shortly thereafter, defendants asked Hall for a ride so all four men drove to the area of Hamilton and Winchester in Goetz's Jeep Cherokee. Beloney told Goetz that they were going to " 'jack some fools,' " which Goetz understood to mean that they were going to rob some people, and somebody directed Goetz where to go. Defendants told Hall that they were going to get some "dope."

When they drove through the parking lot of an apartment complex, Goetz and Hall saw two black men in the parking lot standing next to a Subaru. They felt that the men were giving them dirty looks, and defendants commented about it. Goetz drove past the men and parked. Defendants got out of Goetz's car and told Hall and Goetz to wait there.

After a while, Beloney came back to the Jeep and asked Hall if he knew how to drive a stick. Hall answered affirmatively and got out of the car. Beloney told Goetz to drive to the gas station they had passed on the way, and to wait for them. Goetz did so. Hall followed Beloney to the Subaru, where Hall heard Darbey accuse one of the men of taking his brother's car. Darbey pulled the men aside and told them to get down on their knees. Hall got into the Subaru, drove it

**United States District Court**
For the Northern District of California

out of the parking lot, and parked it on the street. Defendants ran toward the Subaru and got in, and Hall drove it back to his apartment.

After about one half hour, Goetz received a phone call telling him that the others had arrived back at Hall's apartment. When Goetz arrived at the apartment, defendants and Hall were discussing what they were going to do with the Subaru and Hall mentioned subwoofers. Goetz told defendants that they could strip down the car in his garage in exchange for the subwoofers. They agreed. Goetz drove to his house and defendants and Hall arrived there in the Subaru. They parked the Subaru in Goetz's garage and all four of them took the stereo system out of the car. Goetz put the subwoofers and the car alarm in his room and the rest of the stereo system was loaded into Goetz's Jeep. They all pushed the Subaru down the hill where Goetz lived and drove the Jeep back to Hall's apartment, where the stereo was unloaded. Defendants also had a wallet and a cell phone that they had taken from the men.

After defendants' arrest, Beloney called Hall from jail and told him to get rid of whatever property was left. Officers recovered a pool cue, a wallet, and a B.B. gun from Hall's apartment and "wires, horns, woofers," and a basketball from Goetz's house. Goetz testified that he pleaded guilty to possession of stolen property as a result of the incident and Hall testified that he pleaded guilty to carjacking as a result of the incident.

Lieutenant Laurence Ryan interviewed Beloney on March 24, 2004. Beloney admitted being a member of the Seven Trees gang, and said that he had tattoos indicating his membership. Beloney initially denied involvement in the carjacking incident, but later admitted that he and Hall took the vehicle, and that he, Hall and Goetz stripped the vehicle at Goetz's house.

(Resp't. Ex. F at 3-5.)

### III.  Statement of Issues

Petitioner raises fourteen claims in his petition.  They are, in the order he presents them:  (1) There was insufficient evidence to support gang enhancement; (2) the prosecution committed misconduct in closing argument by misstating an element of the gang enhancement; (3) the court "abused its discretion" in failing to admonish the jury regarding the hearsay evidence upon which a gang expert relied in testifying; (4) the trial court "erred" in not instructing that there must be a relationship between the gang and the crime changed for the enhancement to apply; (5) trial counsel was ineffective in failing to object to hearsay evidence upon which the gang expert relied and in failing to request a limiting instruction regarding that evidence; (6) trial counsel was ineffective in failing to move to exclude testimony by his accomplices; (7) there was insufficient evidence to support the robbery and hijacking convictions; (8) trial counsel was

9

1  ineffective in failing to move to dismiss count two on grounds the evidence was

2  insufficient; (9) his due process rights were violated by the trial court's instructing the

3  jury with CALJIC 17.24.2, which had the effect of reducing the prosecution's burden of

4  proof; (10) his due process rights were violated by the trial court's failure to give a

5  defense proposed pinpoint instruction; (11) his trial counsel was ineffective in failing to

6  object to hearsay; (12) there was insufficient evidence to support the specific intent

7  element of the gang allegation; (13) trial counsel was ineffective in failing to move to

8  bifurcate the trial on the gang allegation; and (14) appellate counsel was ineffective in

9  failing to raise issues one through thirteen.

10      Due to overlap with respect to Petitioner's claims, the Court will consider them in

11  three groups:  (1) Ineffective assistance of trial counsel claims (claims six, eight, eleven,

12  and fourteen); (2) sufficiency of the evidence (claim seven); and (3) gang enhancement

13  claims (claims one through five, nine, ten, twelve, and thirteen).

14  **IV.    Ineffective Assistance of Trial Counsel Claims**

15      Petitioner contends that his trial counsel was ineffective in failing to obtain

16  exclusion of  the testimony of accomplices (claim six), not moving to dismiss the

17  robbery count (claim eight), failing to object to certain hearsay testimony (claim eleven),

18  and failing to move to bifurcate trial on the gang allegation (count thirteen).

19      The showing required to establish a claim of ineffective assistance of counsel is

20  stated in Strickland v. Washington, 466 U.S. 668 (1984):

21          A convicted defendant's claim that counsel's assistance was so
        defective as to require reversal of a conviction or death sentence has two
22        components. First, the defendant must show that counsel's performance
        was deficient. This requires showing that counsel made errors so serious
23        that counsel was not functioning as the "counsel" guaranteed the
        defendant by the Sixth Amendment. Second, the defendant must show that
24        the deficient performance prejudiced the defense. This requires showing
        that counsel's errors were so serious as to deprive the defendant of a fair
25        trial, a trial whose result is reliable. Unless a defendant makes both
        showings, it cannot be said that the conviction or death sentence resulted
26        from a breakdown in the adversary process that renders the result
        unreliable.

27  Id. at 687.  "[T]he proper standard for attorney performance is that of reasonably

28

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

1   effective assistance." Id.  "[A] court must indulge a strong presumption that counsel's

2   conduct falls within the wide range of reasonable professional assistance; that is, the

3   defendant must overcome the presumption that, under the circumstances, the challenged

4   action "might be considered sound trial strategy." Id. at 689.

5       When considering an ineffective assistance claim in a habeas case, federal courts

6   must apply a "doubly" deferential standard.  Cullen v. Pinholster, 131 S. Ct. 1388, 1410-

7   11 (2011); Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (same); Premo v. Moore,

8   131 S. Ct. 733, 740 (2011) (same).  When § 2254(d) applies, "the question is not

9   whether counsel's actions were reasonable.  The question is whether there is any

10  reasonable argument that counsel satisfied Strickland's deferential standard."

11  Harrington, 131 S. Ct. at 788.

12      Strickland's second prong requires a showing "that counsel's errors were so

13  serious as to deprive [petitioner] of a fair trial, a trial whose result is reliable."

14  Strickland, 466 U.S. at 687.  To establish prejudice under Strickland, petitioner "must

15  show that there is a reasonable probability that, but for counsel's unprofessional errors,

16  the result of the proceeding would have been different.  A reasonable probability is a

17  probability sufficient to undermine confidence in the outcome." Id. at 694-95.

18      It is unnecessary for a federal court considering a habeas ineffective assistance

19  claim to address the prejudice prong of the test if the petitioner cannot even establish

20  incompetence under the first prong.  Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir.

21  1998).  Similarly, a court need not determine whether counsel's performance was

22  deficient before examining the prejudice suffered by the defendant as the result of the

23  alleged deficiencies.  Strickland, 466 U.S. at 697.

24      **A.**     **Accomplice Testimony**  **(Claim Six)**

25      Petitioner contends he was denied the effective assistance of trial counsel because

26  counsel failed to move for the exclusion of the testimony of (1) accomplices Goetz and

27  Hall, who testified against Beloney and Petitioner in exchange for plea agreements, and

28  (2) Beloney, who admitted having committed the charged offense and implicated

**United States District Court**
For the Northern District of California

Petitioner.  Petitioner argues that the testimony by his co-defendant and accomplices, along with their statements, were the only evidence linking him to the charged offense, "that without this testimony and statements being used against petitioner, there would not have been any evidence by which to convict petitioner."  (Traverse P. & A. at 31) He contends that  "under both state and federal law, the testimony or statements of an accomplice may not be used against a defendant unless there is corroborating evidence linking Petitioner to the charged offense.  see, e.g., California Penal Code § 1111."  (Id. at 29.)

In denying Petitioner's state habeas petition raising this claim, the Superior Court found that "accomplice testimony is admissible. . . . Therefore, there was no reason for his attorney to object."  (Ex. J at 1.)  The court cited People v. Frye, 18 Cal. 4th 894, 968 (1998), disapproved on other grounds, People v. Doolin, 45 Cal. 4th 390, 421 n.22 (2009).  (Id.)  "Although the accomplice's testimony is admissible and competent, such testimony has been 'legislatively determined' never to be sufficiently trustworthy to establish guilt beyond a reasonable doubt unless corroborated."  Id., 18 Cal. 4th at 968 (discussing corroboration requirement of California Penal Code section 1111).   In other words, while section 1111 addresses the weight to be accorded to accomplice testimony, it does not itself provide grounds for exclusion of evidence.  Because the evidence was admissible and an objection to it would have been futile, counsel was not ineffective in failing to object.  See Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005) (trial counsel cannot have been ineffective for failing to take futile action).

### B.    Failure to Object to Hearsay Testimony (Claim Eleven)

In his claim eleven, Petitioner asserts that counsel was ineffective in failing to "object to hearsay."  (Pet. at 6B.)  The "supporting facts" he provides are, in their entirety, as follows:   "During trial, prosecutor called a witness to testify as to the count one robbery and carjacking.  [D]uring direct examination, the prosecutor questioned witness as to the count two robbery carjacking.  [C]ounsel failed to object on grounds of hearsay."  (Id.)  This is entirely insufficient to "'state facts that point to a 'real possibility

United States District Court
For the Northern District of California

of constitutional error.'"  Rule 4 Advisory Committee Notes (quoting <u>Aubut v. Maine</u>, 431 F.2d 688, 689 (1st Cir. 1970)).  The claim is subject to denial for failing to state a ground for habeas relief.

The above notwithstanding, the Court will consider Petitioner's explanation of what appears to be this issue in his traverse and in one of his state habeas petitions.  <u>But see</u> <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th Cir. 1994) (traverse not proper pleading to raise additional grounds for relief).  In his traverse, Petitioner contends that the testimony of Kiflom Hailu concerning the crime included inadmissible hearsay of the other victim, Fadel Seck, who did not testify at trial.  (Traverse P. & A. at 13.)  Petitioner claims that only Seck could testify regarding whether or not his property was taken by force or fear.  (<u>Id.</u>)  The admission of the hearsay testimony, Petitioner contends, violated his right to confront and cross-examine Seck and allowed the prosecution to unfairly rely on hearsay testimony to prove the elements of the crime beyond a reasonable doubt.  (<u>Id.</u> at 13-14.)

Petitioner does not identify the specific testimony that he contends was hearsay in the traverse.  In the state petition filed in superior court, he does not quote the purported hearsay, but he does provide a citation, "RT 122, 123," and attaches to the petition that part of the transcript.  (Ex. M at 8, attached Ex. I).  The portion of the transcript attached to the state petition, which can be found in the record lodged with this Court at exhibit B, pages 122-24, is part of Hailu's testimony.  In said testimony, he does not recite anything said by Seck – that is, there is no hearsay in the portion of the transcript provided.

The state superior court rejected Petitioner's claim because "The testimony was not hearsay where Hailu testified to what he <u>saw</u>."  (Exh. J at 2 (emphasis in original).)  The Court agrees.  Counsel was not ineffective in failing to make a hearsay objection, as there was no hearsay.

**C.    <u>Failure to Move to Dismiss</u> (Claim Eight)**

In his petition, Petitioner contends that his trial counsel was ineffective in failing

13

1    to move to dismiss count two (the robbery count) "on grounds of insufficient evidence."

2    (Pet. at 6A.)  Counsel did, however, make such a motion, arguing that there was not

3    substantial evidence that Petitioner intended to permanently deprive non-testifying

4    victim Seck of his property.  (Ex. B (reporters transcript) at 535-37.)  For that reason,

5    this claim is without merit.

6         Alternatively, Petitioner contends in his traverse and in his state habeas petition

7    that counsel's error was in not arguing that count two should be dismissed because

8    Petitioner's Confrontation Clause rights were violated when victim Seck failed to testify.

9    (Traverse P. & A. at 11-12; Ex. M (state habeas petition in superior court) at 5.)

10   Because no hearsay from Seck was admitted, however, there was no Confrontation

11   Clause violation.  A motion to dismiss on confrontation grounds would have been futile;

12   thus, counsel was not ineffective in failing to make that argument.

13              **D.    Failure to Move to Bifurcate (Claim Thirteen)**

14        In claim thirteen, Petitioner contends that counsel was ineffective in failing to

15   move to try the substantive charges separately from the gang allegations.  This claim was

16   not raised on direct appeal, but was raised in a state habeas petition filed in superior

17   court.  (Ex. M at 10-10A.)

18        The state court denied Petitioner's claim, relying on People v. Hernandez, 33 Cal.

19   4th 1040 (2004), which held that a trial court has discretion to grant or deny a motion to

20   bifurcate.  (Ex. J at 2.)  In its decision, the Hernandez court held that "evidence of gang

21   membership is often relevant to, and admissible regarding, the charged offense.

22   Evidence of the defendant's gang affiliation – including evidence of the gang's territory,

23   membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the

24   like – can help prove identity, motive, modus operandi, specific intent, means of

25   applying force or fear, or other issues pertinent to guilt of the charged crime."

26   Herndandez, 33 Cal. 4th at 1049.  "To the extent the evidence supporting the gang

27   enhancement would be admissible at a trial of guilt, any inference of prejudice would be

28   dispelled, and bifurcation would not be necessary."  Id. at 1049-50.  And even "if some

1  of the evidence offered to prove the gang enhancement would be inadmissible at a trial

2  of the substantive crime itself—for example, if some of it might be excluded under

3  Evidence Code section 352 as unduly prejudicial when no gang enhancement is

4  charged—a court may still deny bifurcation." Id. at 1050.

5      On the other hand, where evidence of prior criminal gang activity is not related to

6  the crime or the defendant, and is so "extraordinarily prejudicial ... that it threatens to

7  sway the jury to convict regardless of the defendant's actual guilt," a motion to bifurcate

8  may be granted. Id. at 1049.

9      Petitioner contends that evidence offered to support the gang enhancement

10  penalty was unnecessary to establish guilt, the identity of the perpetrators, or how force

11  or fear was used to commit the robbery and carjacking offenses, because other evidence

12  was presented on these issues.  That contention misses the point.  The salient issue is

13  whether the gang evidence would have been admissible at trial, absent the gang

14  enhancement allegations, on the traditional bases of "identity, motive, modus operandi,

15  specific intent, means of applying force or fear, or other issues pertinent to guilt of the

16  charged crime," id., as indeed it was.  There was evidence that Petitioner is a member of

17  the Seven Hills gang, that the victims were perceived by the defendants as disrespecting

18  the gang, and that it was important to the gang to punish any disrespect.  At a minimum,

19  that evidence was admissible to provide identity and motive.  A motion to sever would

20  not have succeeded, so counsel could not have been ineffective in failing to make one.

21  **V.   Sufficiency of the Evidence Claim (Claim Seven)**

22      Petitioner contends that the evidence was insufficient to support his conviction on

23  count two, the charge that he was guilty of robbery of Seck.  (Pet. at 6A.)

24      The Due Process Clause "protects the accused against conviction except upon

25  proof beyond a reasonable doubt of every fact necessary to constitute the crime with

26  which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who

27  alleges that the evidence in support of his state conviction cannot be fairly characterized

28  as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt

United States District Court
For the Northern District of California

therefore states a constitutional claim, <u>Jackson v. Virginia</u>, 443 U.S. 307, 321 (1979), which, if proven, entitles him or her to federal habeas relief, <u>id.</u> at 324.  The federal court determines only whether, "after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Id.</u> at 319 (emphasis in original).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  <u>Id.</u> at 324.  When considering a sufficiency of the evidence claim, the Court must "view[] the evidence in the light most favorable to the prosecution," and therefore, it must be presumed that the jury believed the prosecution's witnesses.  See <u>Jackson</u>, 443 U.S. at 319,

Petitioner argues that because there was no testimony from Seck, the jury could not find that his property was taken from him by force or fear.  However, there was testimony from the other victim, Hailu, who heard one of the robbers state on the telephone:  "'Is this the car?'  'Are these the niggers?'  'If these are the niggers, then we are going to blow them.'"  (Ex. F at 3.)  Hailu thought that the men were going to shoot them, so he was afraid.  (<u>Id.</u>)  In addition, there was evidence that:

> The second man put on some gloves. The first man went through Hailu's and Seck's pockets and then the second man did the same thing. The men took Hailu's cell phone and wallet and a photocopy of Seck's passport. After the men took the baseball cap from Seck's head they took Hailu and Seck behind a wall. The first man told Hailu and Seck to get down on their knees, and they did. The first man told the second man to get the "heat." The second man left, then came back and just stood there. The first man left, then came back with a third man that Hailu could hear but not see. The first man said, " 'I'm going to take your car and show it to my brother. If this is the car that he saw, then, you know, you guys are dead. If it's not, then we are going to leave it there.' "  The third man then drove off with Hailu's Subaru. The first two men waited for a few minutes and then left.

(<u>Id.</u> at 3-4.)

Thus, despite Petitioner's claims to the contrary, there was evidence presented from which the jury could reasonably infer that the property taken from Seck was taken by means of force or fear.  This claim is without merit.

**VI.    Gang Enhancements (Claims One Through Five, Nine, Ten, Twelve, and Fourteen)**

The California Street Terrorism Enforcement and Prevention Act (also known as the STEP Act) is codified in sections 186.20 through 186.33 of the California Penal Code. Subdivision (a) of section 186.22 defines a stand-alone substantive crime which penalizes committing or aiding and abetting a felony while being an active participant in a gang. Subdivision (b) of section 186.22 prescribes a sentencing enhancement when a felony is committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Petitioner was charged under 186.22(b)(4).

**A.    Sufficiency of the Evidence (Claims One and Twelve)**

Petitioner contends that there was insufficient evidence to support the street gang enhancements generally (claim one in the petition), and that one of the prosecution's expert witness' testimony was speculative and thus insufficient on the specific intent element of the street gang enhancement (claim twelve). These claims were raised on direct appeal. The Court of Appeal explained the California street gang enhancements applicable here:

> Section 186.22, subdivision (b) imposes punishment of life imprisonment with a minimum of 15 years when a defendant is convicted of "carjacking, as defined in Section 215," "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(4)(B).) The same subdivision imposes a 10-year enhancement when a defendant is convicted of a violent felony such as robbery (see § 667.5, subd. (c)(9)) "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1)(C).) The essential elements of an allegation under this subdivision are: (1) the crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang; and (2) these crimes were committed with the specific intent to promote, further, or assist in any criminal conduct by gang members. (People v. Morales (2003) 112 Cal. App. 4th 1176, 1198 (Morales).) The jury was so instructed. (See CALJIC No. 17.24.2; see also, CALCRIM No. 1401.) Defendants contend that the prosecution failed to establish either one of these essential elements. They argue that the evidence showed that they "appeared to be joined with two persons who had little or no relation to the gang," and that there was a lack of a connection to any real gang motive, benefit or connection other than their

1    own supposed gang membership.

2    (Ex. F at 12-13.)

3        Expert testimony about street gangs was offered at trial by Detective Sass. The

4    Court of Appeal summarized her testimony as follows:

5

6                                **Gang evidence**

7        Officer Tamara Sass testified as an expert in African-American
    criminal street gangs. She testified that San Jose is predominantly a Crips
8    town, and that the Seven Trees Crips started in 1984 or 1985. Since that
    time, the several San Jose Crips gangs, including Seven Trees Crips, Dark
9    Side Mob, 408 Crips and South Side Crips, have merged and joined
    forces. Currently there are approximately 50 total and 20 validated and
10   admitted Seven Trees Crips members. San Jose police validate gang
    members by their individual admissions to being a member as well as by
11   their gang clothing and tattoos, their use of gang hand signs and graffiti,
    and their participation in crimes with other gang members. Crips members
12   claim the color blue. In her opinion, Seven Trees Crips is an ongoing
    criminal street gang, the primary activities of which are witness
13   intimidation, criminal threats, assaults with a deadly weapon, possession
    of drugs for sale, homicide, carjacking, and robbery. Her opinions are
14   based on the following incidents.

15       On February 1, 1995, two Dark Side Mob members accused the
    victim of stealing guns from their gang. They took the victim to a school,
16   where defendant Beloney and his brother Edmond joined them. Edmond
    Beloney held a gun on the victim while the Dark Side Mob members
17   robbed the victim of $400, and then assaulted him. On August 12, 1997,
    four Seven Trees Crips gang members were stopped for a Vehicle Code
18   violation. Officers found cocaine, a .22 caliber handgun, and large
    amounts of cash on the men. On August 25, 1997, two admitted Seven
19   Trees gang members got into a fight with, and later shot, a man because
    the man was selling drugs in an area the gang claimed as their turf. On
20   December 26, 1997, an admitted Seven Trees Crips member went to the
    victim's home, put a gun to the victim's head and pulled the trigger,
21   because he felt that the victim had disrespected him when he had earlier
    called the home. When the gang member saw red objects in the house,
22   which he said were indicia of a rival gang, he assaulted the victim.

23       On February 19, 2000, two black men came out of a party and
    were accosted by two admitted Seven Trees gang members who had not
24   been allowed inside for the party. The gang members shot one victim and
    shot at the other. The gun used was found, and there were gang indicia
25   including tagging, photographs, and clothing inside one gang member's
    room. On May 28, 2000, two black males claiming to be Seven Trees
26   Crips members assaulted a man outside a convenience store after the man
    made some comments to them inside the store. On December 28, 2000, a
27   Seven Trees gang member went to the house of the victim and demanded
    money that he felt was owed to him. When the victim refused to pay, the
28   gang member assaulted her while another man with him said that it was "

18

'Seven Trees Business.' " The victim's daughter paid the money in order to get the men out of the house. Two weeks later, when the victim called one of the men, asking to get some of her daughter's property back from him, the man said,

"'I'll have your ass on a platter. You don't know who you are messing with.'"

On April 14, 2002, two South Side Crips members took a car at a 7-Eleven at gun point. On November 16, 2002, Richard Knight, a validated Seven Trees gang member, went to the victim's home with another gang member and robbed the victim at gunpoint of some jewelry and marijuana. On April 16, 2003, an admitted Seven Trees gang member committed a battery on an A.P.G. gang member on a school campus, after the A.P.G. gang member disrespected him. On September 26, 2003, a Seven Trees gang member called a white male, who had wanted to be a gang member but who was not accepted by the gang, and threatened him. Both the male and his family feared for their lives.

On January 18, 2004, two men demanded a victim's money, then punched him in the face, knocked him to the ground, and took his wallet and cell phone. As the two men drove away, one yelled " 'Seven Trees.' " On January 30, 2004, Dante Watts requested protective custody while in jail because of being an admitted Seven Trees gang member. On March 14, 2004, Peter Hodges was contacted by police following a car stop. He had an "S" and a "7" tattooed on his left arm and a "J" and "Trees" tattooed on his right arm, and admitted being a Seven Trees gang member. On March 27, 2004, Richard Knight was stopped by police. He had "Crip" tattooed on his back and "7 Tree" tattooed on his stomach, and he admitted being a Seven Trees gang member for 10 years. On May 4, 2004, Deon Watts was stopped for a Vehicle Code violation. He had an "S," a "J," a "7," and "Trees" tattooed on his arms. He claimed to be a Seven Trees gang member for life. On September 15, 2004, the victim bragged that he had fought a Seven Trees gang member earlier that day and had beat him. Richard Knight returned to the area of the fight with a baseball bat and five other gang members and assaulted the victim with the bat. On February 8, 2005, a Seven Trees gang member with Seven Trees tattoos backed up some Norteno gang members during a gang fight in Seven Trees turf, brandishing a gun and committing assault with a deadly weapon.

Officer Sass testified that in her opinion, Darbey is a current member of the Seven Trees gang. Her opinion is based on field interview cards, prior police contacts and police reports. On April 26, 1993, Darbey was arrested for attempted auto burglary in Seven Trees turf. At the time of the attempted burglary and his arrest, Darbey was wearing blue sweats. On December 6, 1994, Darbey was involved in an assault with a deadly weapon with an admitted Crips gang member in an area known to be Seven Trees turf. On January 13, 1996, Darbey was involved in an assault with a deadly weapon and robbery in downtown San Jose near Seven Trees turf. On May 20, 1998, Darbey was loitering in Seven Trees turf in downtown San Jose. On June 1, 1998, Darbey was with another validated gang member when she was arrested for selling cocaine in an area known to be Seven Trees turf. On December 20, 1998, Darbey was under the influence of a stimulant in a known Seven Trees gang area. At the time, he was wearing blue shoes and had a " 'B.K.' " scar on his chest. B.K. stands

United States District Court
For the Northern District of California

for "blood killer," and is seen often on gang graffiti and tattoos. On February 2, 1999, when Darbey was contacted by police in downtown Seven Trees turf, he was concealing a 22-ounce baseball bat under his jacket. On March 12, 1999, Darbey was with defendant Beloney in Seven Trees turf in downtown San Jose. On March 27, 1999, Darbey was found to possess less than one ounce of marijuana in Seven Trees turf in downtown San Jose. On April 18, 1999, Darbey assaulted a victim in downtown Seven Trees turf while wearing a blue shirt. On November 28, 2001, Darbey admitted to San Bernardino county jail personnel that he was a member of the Seven Trees gang. In addition, the day after the carjacking, Darbey was involved in a home invasion robbery with defendant Beloney and Edmond Beloney of a person who had disrespected Darbey in front of other gang members and non-gang members.

Officer Sass also testified that, in her opinion, defendant Beloney is a member of the Seven Trees gang. Her opinion is based on conversations with other officers, field interview cards, and his admission to Lieutenant Ryan in this case. On March 21, 1994, Beloney was with Darbey in downtown San Jose when he was found by officers to be purchasing marijuana. On February 1, 1995, Beloney and his brother Edmond were involved in the assault at a school carried out by Dark Side Mob gang members. On May 18, 1998, Beloney flashed a gang sign at an officer while he was with a validated Seven Trees gang member. On March 14, 1998, officers responded to a report of a disturbance in downtown San Jose. The suspect fled, and was never caught. However, officers spoke to Beloney, who was at the scene wearing a blue cap. On August 24, 1998, Beloney was found to be selling narcotics in downtown San Jose Seven Trees turf. On December 8, 1998, Beloney was found to have "7" tattooed on his left arm and "Trees" tattooed on his right arm. He was wearing a blue Dallas Cowboys jacket and a belt with an "S" buckle. On March 12, 1999, Beloney was found with a concealed weapon in downtown San Jose Seven Trees turf. On May 5, 1999, Beloney was found to possess, sell, and be under the influence of cocaine in downtown San Jose Seven Trees turf. In addition, the day after the carjacking, Beloney was involved in a home invasion robbery with his brother Edmond and Darbey of a person who had disrespected Darbey in front of other gang members and non-gang members.

Officer Sass also testified that, in her opinion, the carjacking and robbery in this case were committed for the benefit of and in association with a criminal street gang. Defendants are members of the Seven Trees gang and they felt that the victims had disrespected them and that they had to save face. Gang members have to retaliate if they are disrespected, as disrespecting one member is disrespecting the whole gang. Gangs that have not stood up to disrespect or to a challenge by a rival gang have disintegrated. In addition, during this incident, defendants had the victims kneel down, showing the victims defendants' power over them. Defendants also gained financially from the property they took, and gained respect and reputation by committing the offenses in the presence of non-gang members.

(Id. at 6-10.)

As to the first element of the gang enhancement (i.e., that the crimes charged

20

were committed for the benefit of, at the direction of, or in association with a criminal street gang), the California Supreme Court has held "[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1)." People v. Albillar, 51 Cal. 4th 47, 63 (2010). Here, Detective Sass testified about the culture and habits of the Seven Trees Crips, specifically gang members' need to save face by retaliating against those who disrespect them, and benefits derived from showing their power over victims to non-gang members. Under Albillar , this is sufficient evidence on the first element of the gang enhancement charge.

As to the second element, (i.e., that the crimes were committed with the specific intent to promote, further, or assist in any criminal conduct by gang members), the California Supreme Court has held "[t]here is no further requirement that the defendant act with the specific intent to promote, further, or assist a gang; the statute requires only the specific intent to promote, further, or assist criminal conduct by gang members." Id. at 67; see People v. Morales, 112 Cal. App. 4th 1176 (2003) ("defendant's intentional acts, when combined with his knowledge that those acts would assist crimes by fellow gang members, afforded sufficient evidence of the requisite specific intent."). Petitioner and Beloney in tandem with Goetz and Hall set out to "jack some fools," took the victims' cell phone, wallet and a baseball cap, told the victims they were going to take the victim's car, went and got "heat," told Hall to drive the car away, and helped remove the stereo system from the stolen car. These acts, when combined with Beloney's admission that he was a member of the Seven Trees gang, Petitioner's admission to San Bernardino county jail personnel that he was a member of the Seven Trees gang, police records indicating Petitioner was involved in criminal activity on or near Seven Trees' turf, Goetz' testimony that Hall and others told him Darbey also belonged to the Seven Trees gang, and the testimony of Petitioner's grandfather and Beloney's mother that Darbey was close friends with Beloney and Beloney's brother and both the Beloney

twins have 'Seven Trees' tattoos, constitute sufficient evidence to justify imposition of the gang enhancement penalty.

Petitioner argues in his traverse that "the claim raised herein this instant ground [sic] focuses on the gang expert's "Opinion Testimony" being based on speculation."[1] (Traverse P. & A. at 6-7.)  That is, it appears his contention is that Detective Sass' testimony was so speculative that a rational jury could not find it sufficient to support the gang allegations.  He says:

> First: The testimony of the expert speculates that the victims did in fact stare[] at the perpetrators; Second: The testimony of the expert speculates and forms the conjecture that Petitioner and or the co-defendant felt disrespected; Third: The testimony that either of the accomplices or Petitioner and co-defendant felt as thought the gang was disrespected is wholly conceived from speculation and conjecture; Fourth: The testimony of the expert that Petitioner and the co-defendant felt as though they had lost face and needed to do something to save face is also spent [sic] from whole cloth, speculation and conjecture; and finally Fifth:  There was no evidence that someone gained respect for Petitioner or co-defendant, or that their reputation increased or that the gang's reputation increased.  The prosecutor didn't ask whether or not the accomplices gained respect or an increase in respect for Petitioner or the co-defendant.

> In short the opinion testimony of the prosecutor's gang expert is derived entirely from speculation that has no foundation or evidentiary support.

(Traverse P. & A. at 7-8.)

The California Supreme Court has addressed the evidentiary issues raised by Petitioner.  In <u>People v. Gardeley</u>, 14 Cal. 4th 605 (1996), the court held  that "[t]he subject matter of the culture and habits of criminal street gangs ... meets [the] criterion [of Evidence Code section 801 defining the admissibility of expert testimony]. [Citations.] . . . ." <u>Id</u>. at 617.  In <u>People v. Ward</u>, 36 Cal. 4th 186 (2005), the appellant claimed experts offered improper opinions about "his state of mind and intent at the time of the shooting." <u>Id</u>. at 209.  The court held:  "The substance of the experts' testimony, as given through their responses to hypothetical questions, related to defendant's motivation for entering rival gang territory and his likely reaction to language or actions

---

[1] This is claim twelve in the petition.

he perceived as gang challenges. . . . [E]xperts did not render an impermissible opinion as to defendant's actual intent; rather, they properly testified as to defendant's motivations for his actions." Id. at  209-10.

Facts supporting Detective Sass' opinion included evidence that Darbey and Beloney were members of the Seven Trees Crips gang and had been involved in gang-related criminal activity in the past.  There was testimony that Goetz and Hall saw two black men in the parking lot standing next to a Subaru who they felt "were giving them dirty looks."  (Ex. F. at 4.)  One of the four accomplices to the crime asked, concerning the victims, "What are they doing mugging at us?" (RT 148).

There was clear evidence that Petitioner and his companions thought they were being disrespected by the victims' perceived "mugging."  Expert testimony concerning a gang member's likely reaction to language or actions he perceived as a gang challenge was properly admitted.  See Ward, 36 Cal. 4th at 210.  Expert testimony that "gang members increase their respect within their set and the community through acts of violence and intimidation" has also been held to be probative evidence.  See People v. Garcia, 168 Cal. App. 4th 261, 276 (2008).  Detective Sass' opinions were based on field interview cards, prior police contacts and police reports, about the Seven Trees Crips gang and Petitioner and the Beloneys.  (Ex. F at 8, 9.)  She described numerous instances of violent behavior of gang members protecting their turf and reputation, retaliating for disrespect, flaunting gang symbols, and bragging about gang actions.  Petitioner is incorrect that Sass' testimony was insufficient to support the gang enhancement because it was speculative.

Given that California law holds that expert testimony may be admitted and is probative on the elements of a gang enhancement – a holding that is binding on this Court, see Bradshaw v. Richey, 546 U.S. 74, 76 (2005) – the evidence of Detective Sass was sufficient for a rational finder of fact to find both elements of the gang enhancement, that the offenses were "committed for the benefit of, at the direction of, or in association with any criminal street gang," and that they were committed "with the specific intent to

23

**United States District Court**
For the Northern District of California

1    promote, further, or assist in any criminal conduct by gang members." This claim is

2    without merit.

3       **B.    Prosecutorial Misconduct (Claim Two)**

4       Petitioner claims that the prosecutor misstated the law, and thus committed

5    misconduct, by arguing to the jury that it did not have to decide the issue of whether the

6    crime was committed with the intent to benefit the gang. (Pet. at 6.)

7       This claim was raised on direct appeal. The Court of Appeal held that the

8    prosecutor correctly stated California law, considering his argument as a whole. (Ex. F

9    at 14-18.) The California courts' conclusion that California law is as the prosecutor

10   stated it to be is binding on this court. See Bradshaw, 546 U.S. at 76 (a state court's

11   interpretation of state law, including one announced on direct appeal of the challenged

12   conviction, binds a federal court sitting in habeas corpus). As a result, there was no

13   misstatement of the law, and no misconduct.

14      To support his contention that the prosecutor's version was a misstatement of the

15   law, Petitioner cites Garcia v. Carey, 395 F.3d 1099 (9th Cir. 2005).[2] The California

16   Supreme Court has made clear, however, that it rejects the Ninth Circuit's construction

17   of section 186.22(b)(1) in Garcia "to require evidence that a defendant had the specific

18   intent to further or facilitate other criminal conduct." Albillar, 51 Cal. 4th at 65-67.

19         The conflict between our state courts and the federal courts as to
20      the interpretation of section 186.22(b)(1) has persisted. After Briceno was
         decided, People v. Vazquez, supra, 178 Cal. App. 4th at pages 353-354,
21      observed, "While our Supreme Court has not yet reached this issue,
         numerous California Courts of Appeal have rejected the Ninth Circuit's
22      reasoning. As our colleagues noted in People v. Romero, [supra,] 140 Cal.
         App. 4th [at page] 19 . . . . 'By its plain language, the statute requires a
23      showing of specific intent to promote, further, or assist in "any criminal
         conduct by gang members," rather than other criminal conduct. (§ 186.22,
24      subd. (b)(1), [emphasis added.]' . . . . [¶] Like the Romero court, we
         reject the Ninth Circuit's attempt to write additional requirements into the
25      statute. It provides an enhanced penalty where the defendant specifically
         intends to `promote, further, or assist in any criminal conduct by gang
26      members.' (§ 186.22, subd. (b)(1).) There is no statutory requirement that
         this `criminal conduct by gang members' be distinct from the charged

27  _____

28      [2] Prior to the decision in Albillar, the Ninth Circuit followed Garcia in Briceno v.
    Scribner, 555 F.3d 1069, 1083 (9th Cir. 2009).

United States District Court
For the Northern District of California

1    offense, or that the evidence establish specific crimes the defendant
     intended to assist his fellow gang members in committing." (See also
2    People v. Hill, supra, 142 Cal. App. 4th at p. 774.)

3          We agree with this construction of the gang enhancement. In part I,
     ante, we determined that similar statutory language in section 186.22(a),
4    which applies to an active participant in a gang who "willfully promotes,
     furthers, or assists in any felonious criminal conduct by members of that
5    gang," was not ambiguous and extended to any felonious criminal
     conduct, not just felonious gang-related conduct. We likewise find that the
6    scienter requirement in section 186.22(b)(1)—i.e., "the specific intent to
     promote, further, or assist in any criminal conduct by gang members"—is
7    unambiguous and applies to any criminal conduct, without a further
     requirement that the conduct be "apart from" the criminal conduct
8    underlying the offense of conviction sought to be enhanced.

9    People v. Albillar, 51 Cal. 4th 47, 65 (2010) (emphasis in original). Petitioner's reliance

10   on Garcia is misplaced. See Briceno, 555 F.3d at 1080 (Ninth Circuit is bound by

11   highest state court's interpretation of state law) (citing Dimidowich v. Bell & Howell,

12   803 F.2d 1473, 1482 (9th Cir. 1986)). As such, there was no violation of due process

13   because the prosecutor's argument correctly stated California law.

14         **C.    Refusal to Admonish Jury (Claim Three)**

15         Petitioner contends that the trial court "abused its discretion" by refusing to

16   instruct the jury that a hearsay upon which the expert based her opinion was "not offered

17   for the truth of the matter asserted." (Pet. at 6.) He does not contend that the failure to

18   instruct violated any federal law. This is insufficient to "point to a 'real possibility of

19   constitutional error.'" Rule 4 Advisory Committee Notes (quoting Aubut v. Maine, 431

20   F.2d 688, 689 (1st Cir. 1970). Petitioner therefore cannot obtain federal habeas relief on

21   this ground. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (federal habeas

22   unavailable for violations of state law or for alleged error in the interpretation or

23   application of state law).

24         Alternatively, the Court will liberally construe this claim as one that Petitioner's

25   due process rights were violated by the trial court's failure to give the instruction. This

26   claim  was not raised on direct appeal, but it was raised in Petitioner's state habeas

27   petition filed in the California Supreme Court, and thus, it is exhausted. (Ex. M at 12-

28   12A.)

The Court of Appeal set out the background in its discussion of the state law claim:

> Prior to Officer Sass's testimony, the court instructed the jury with CALJIC No. 17.24.3 as follows. "Evidence will be introduced for the purpose of showing criminal street gang activities and of criminal acts by gang members of the defendants, or other crimes by other defendants that are on trial [sic]. Except as otherwise instructed, this evidence if believed, may not be considered by you to prove that the defendants in this case are persons of bad character, or that they possess a disposition to commit crimes. It may be considered by you for the limited purpose of determining if it tends to show that the crime or crimes charged were committed for the benefit of, at the direction of, or in association with the criminal street gang with the specific intent to promote, further or assist in any criminal conduct by gang members.
>
> "For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as you do with all other evidence in the case. You are not permitted to consider such evidence for other purposes."
>
> After the court ruled that Officer Sass could testify as an expert on African-American criminal street gangs, the court instructed the jury with CALJIC No. 2.80 as follows: "A witness who has special knowledge, skill, experience, training or education in a particular subject will testify to certain opinions. This type of witness is referred to as an expert witness.
>
> "In determining what weight to give to any opinion expressed by an expert witness, you should consider the qualifications and believability of the witness, the facts or materials upon which each opinion is based, and the reasons for each opinion.
>
> "An opinion is only as good as the facts and reasons on which it is based. If you find that any fact has not been proved or has been disproved, you must consider that in determining the value of the opinion.
>
> "Likewise, you must consider the strengths and weaknesses of the reasons in which it is based. You are not bound by an opinion. Give each opinion the weight you find it deserves. You may disregard any opinion if you find it to be unreasonable."
>
> Following Officer Sass's testimony regarding the bases for her opinions that there were approximately 50 members of the Seven Trees Crips gang in San Jose, the prosecutor asked the court: "And I'm not sure, your honor, when you admonished the jury, that you informed them that as an expert, the officer can rely on hearsay in forming her opinion." The court responded: "I don't think we need to do that, okay?" The prosecutor said, "Okay." The court repeated CALJIC No. 2.80 at the close of the case, and also gave CALJIC No. 2.09 [evidence limited as to purpose]. [Footnote 3: CALJIC No. 2.09 states: "Certain evidence was admitted for a limited purpose. [¶] At the time this evidence was admitted you were instructed that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. [¶] Do not consider this evidence for any purpose except the limited purpose for which it was

26

**United States District Court**
For the Northern District of California

1    admitted."]  The court refused to give Darbey's proposed instruction on
2    expert testimony related to gang evidence, finding the instruction
     duplicative of CALJIC No. 2.80.  [Footnote 4: Darbey's proposed
3    instruction stated: "A qualified expert, may in certain occasions, render an
     opinion concerning whether the defendant acted for the benefit of, at the
4    direction of, or in association with a criminal street gang. However, the
     law is clear that any material that forms the basis of such an opinion must
5    be reliable. The law does not accord to the expert's opinion the same
     degree of credence or integrity as it does to the data underlying the
6    opinion."]  The court never instructed the jury that an expert did and could
     rely on hearsay as a basis for her opinions, nor did the court instruct the
7    jury that the hearsay relied upon by the expert was not admitted for the
     truth of the matter asserted.

8    (Ex. F at 19-21.)

9         A state trial court's refusal to give an instruction does not alone raise a ground

10   cognizable in a federal habeas corpus proceedings.  Dunckhurst v. Deeds, 859 F.2d 110,

11   114 (9th Cir. 1988).  The error must so infect the trial that the defendant was deprived of

12   the fair trial guaranteed by the Fourteenth Amendment.  Id.  The omission of an

13   instruction is less likely to be prejudicial than a misstatement of the law.  Walker v.

14   Endell, 850 F.2d 470,  475-76 (9th Cir. 1987) (citing Henderson v. Kibbe, 431 U.S. 145,

15   155 (1977)).  Thus, a habeas petitioner whose claim involves a failure to give a

16   particular instruction bears an "'especially heavy burden.'"  Villafuerte v. Stewart, 111

17   F.3d 616, 624 (9th Cir. 1997) (quoting Henderson, 431 U.S. at 155).  The significance of

18   the omission of such an instruction may be evaluated by comparison with the

19   instructions that were given.  Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir.

20   2001).

21        Here, the trial court gave a limiting instruction stating that the evidence could be

22   considered only as going to the gang allegations, and not to show propensity.  That

23   Petitioner was a member of the Seven Trees Crips was not really disputed; Goetz and

24   Hall testified to this fact – and, in any event, Sass' properly admitted opinion testimony

25   was sufficient to support the elements of the gang enhancement.  The failure to give the

26   instruction did not so infect the trial as to deprive Petitioner of a fair trial, and for the

27   same reason the absence of the instruction could not have had a substantial and injurious

28   effect or influence in determining the jury's verdict.  Brecht v. Abrahamson, 507 U.S.

1    619, 629 (1993) (harmless error standard for federal habeas cases).

2          **D.      Instruction on Relationship Between Crime and Gang (Claim Four)**

3          Petitioner contends that the trial court "erred" in not instructing that the words "in

4    association with" in the gang enhancement statute require that there be a "relationship

5    between gang and crime." (Pet. at 6A.)  He does not contend that the failure to instruct

6    violated any federal law.  This claim is thus insufficient to "point to a 'real possibility of

7    constitutional error.'"  Rule 4 Advisory Committee Notes (quoting Aubut, 431 F.2d at

8    689).  Petitioner therefore cannot obtain federal habeas relief on this ground.  See Estelle

9    v. McGuire, 502 U.S. at 67-68 (federal habeas unavailable for violations of state law or

10   for alleged error in the interpretation or application of state law).

11         Alternatively, the Court will liberally construe this claim as one that Petitioner's

12   due process rights were violated by the trial court's failure to give the instruction.  The

13   court of appeal set out the background:

14         [T]he court instructed the jury with CALJIC No. 17.24.2 that the
       "essential elements" of the criminal street gang allegation "are: [¶] 1. The
15     crimes charged were committed for the benefit of, at the direction of, or in
       association with a criminal street gang; and [¶] 2. These crimes were
16     committed with the specific intent to promote, further, or assist in any
       criminal conduct by gang members." The court further instructed that
17     "[t]he Criminal Street Gang Statute, Penal Code section 186.22(b), does
       not criminalize mere gang membership." Darbey submitted proposed jury
18     instructions to the court, but none of the proposed instructions defined the
       term "in association with a criminal street gang." Darbey, joined by
19     Beloney, now contends that the court erred in failing to instruct the jury
       sua sponte that " 'A crime is committed in association with a criminal
20     street gang when there is a relationship between the crime and the gang.' "
       Darbey argues that by failing to so instruct, the court failed to properly
21     define an element of the enhancement. We reject this contention as we
       have found no authority to support Darbey's underlying premise that "a
22     crime is committed in association with a criminal street gang when there is
       a relationship between the crime and the gang."

23
       Darbey cites People v. Gardeley (1996) 14 Cal. 4th 605
24     (Gardeley), in support of his claim. In that case, our Supreme Court stated:
       "[T]he phrase 'for the benefit of, at the direction of, or in association
25     with,'... appears in subdivision (b)(1) of section 186.22. The ... provision
       states that, under certain conditions, a felony conviction qualifies as a
26     street gang crime and hence is subject to increased punishment. By
       inserting the italicized phrase in subdivision (b)(1), the Legislature made it
27     clear that a criminal offense is subject to increased punishment under the
       STEP Act only if the crime is 'gang related,' that is, it must have been
28     committed, in the words of the statute, 'for the benefit of, at the direction

1    of, or in association with' a street gang." (Id. at p. 622, fn. omitted.) The
2    court later stated: "[T]he STEP Act does not punish a defendant for the
     actions of associates; rather the act increases the punishment for a
3    defendant who committed a felony to aid and abet criminal conduct of a
     group that has as a primary function the commission of specified criminal
4    acts and whose members have actually committed specified crimes, and
     who acted with the specific intent to do so." (Id. at p. 624, fn. 10.)

5         Gardeley does not stand for the proposition that "a crime is
6    committed in association with a criminal street gang when there is a
     relationship between the crime and the gang." Rather, Gardeley simply
7    held that a defendant is subject to increased punishment pursuant to
     section 186.22, subdivision (b), when he or she commits a crime that is
8    "gang-related," that is, when the crime is committed "for the benefit of, at
     the direction of, or in association with" a criminal street gang. This is how
9    the trial court instructed the jury in this case. Accordingly, we cannot say
     that the court erred in failing to properly define an element of the
10   enhancement by failing to give the instruction Darbey now claims it was
     required to give sua sponte.

11   (Ex. F at 18-19.)

12        The Supreme Court has held that "it is not the province of a federal habeas court

13   to reexamine state-court determinations on state-law questions." Estelle v. McGuire,

14   502 U.S. at 63.  "[A] state court's interpretation of state law, including one announced

15   on direct appeal of the challenged conviction, binds a federal court sitting in habeas

16   corpus." Bradshaw, 546 U.S. at 76.  In the passage quoted above, the Court of Appeal

17   found that the proposed instruction was not a correct statement of California law.  That

18   conclusion is binding on this Court.  Because Petitioner's proposed instruction misstated

19   California law, the trial court's refusal to present it to the jury does not establish a due

20   process violation.

21        **E.    Instruction – Burden of Proof (Claim Nine)**

22        Petitioner claims that the court's use of CALJIC 17.24.2, when combined with the

23   prosecutor's purported misstatement of California law, "allowed for the jury to convict

24   Petitioner on less than proof of each and every element of the charged offense, where the

25   instruction allows the jury to take for granted that Petitioner's state of mind as to specific

26   intent to assist, can be presumed simply from the fact that Petitioner committed the

27   charged offense with the co-defendant."  (Traverse P. & A. at 24.)  Petitioner contends

28   "the issuance of CALJIC 17.24.2 . . . is contrary to . . . Garcia v. Carey, 395 F.3d 1099."

1   (Id. at 24-25.)

2          Because the California Supreme Court is the ultimate arbiter of state law, that

3   court's interpretation is binding on this Court.  See Briceno, 555 F.3d at 1080 (Ninth

4   Circuit is bound by highest state court's interpretation of state law).  Since CALJIC

5   17.24.2  is in accord with the law as set forth in People v. Albillar, giving the instruction

6   did not violate Petitioner's due process rights.

7          **F.     "Pinpoint" Instructions (Claim Ten)**

8          Petitioner contends that the trial court should have given several pinpoint

9   instructions.  He contends that had those instructions been given, his proposed

10  instructions would have "made simple for the jury the proof necessary to prove the gang

11  enhancement, and specifically informed the jury that mere membership in a gang or

12  action in concert with another gang member is not sufficient to reach a true finding on

13  the gang enhancement."  (Traverse P. & A. at 20.)  Petitioner claims he "had a

14  constitutional right to have the jury instructed on those pin-point instructions so long as

15  there . . . was evidentiary support for the instructions in the record."  (Traverse P. & A. at

16  21-22).

17         As discussed in section VI(B), above, Petitioner's theory about specific intent in

18  the gang enhancement statute is incorrect.  See Albillar, 51 Cal. 4th at 65.  Because the

19  requested instructions did not correctly state California law, the trial court's refusal to

20  give them was not a due process violation.

21

22

23  **VII.   Effective Assistance of Counsel – Gang Enhancments (Claims Five and
          Fourteen)**

24

25         **A.     Trial Counsel**

26         In claim five, Petitioner avers that he was denied effective assistance of counsel.

27  His entire statement of this issue is:  "Right to effective [a]ssistance of counsel violated

28  where counsel failed to object or request instructions."  (Pet. at 6A.)   His "supporting

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

facts" consists of the following:  "Trial counsel failed to make certain objections to the admission of certain evidence, and failed to request that the court issue appropriate instructions.  To extent that counsel['s] failure [is] considered waiver, counsel was ineffective."  (Id.)  This is insufficient to state facts that "point to a 'real possibility of constitutional error.'"  Rule 4 Advisory Committee Notes (quoting Aubut, 431 F.2d at 689).  Petitioner therefore cannot obtain federal habeas relief on this ground.  See Estelle v. McGuire, 502 U.S. at 67-68

Alternatively, although Petitioner does not specify what objections were not made or what instructions were not requested, it appears that he is may be attempting to argue that counsel was ineffective to the extent that his actions or inactions resulted in findings that claims were waived.  Because the Court of Appeal did not predicate its affirmance on any waiver, and because this Court likewise has considered each claim on the merits, Petitioner suffered no prejudice from any putative failure by trial counsel to preserve error.  This claim is without merit.

**B.     Appellate Counsel**

Petitioner contends in claim fourteen that appellate counsel was ineffective in failing to raise those of the claims discussed above that were not raised on direct appeal.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland, 466 U.S. 668. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  A defendant therefore must show that counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal.  Miller, 882 F.2d at 1434 & n.9 (citing Strickland, 466 U.S. at 688, 694).

Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant.  Jones v. Barnes, 463 U.S. 745, 751-54 (1983).  The

31

United States District Court
For the Northern District of California

1  weeding out of weaker issues is widely recognized as one of the hallmarks of effective

2  appellate advocacy.  Miller, 882 F.2d at 1434.  Appellate counsel therefore will

3  frequently remain above an objective standard of competence and have caused his client

4  no prejudice for the same reason – because he or she declined to raise a weak issue.  Id.

5  This court has already determined in the discussion above that petitioner's contentions

6  are without merit, so appellate counsel's failure to raise them on appeal was neither

7  deficient nor prejudicial under the Strickland standard.  Consequently, petitioner did not

8  receive ineffective assistance of counsel on appeal, and he is not entitled to habeas relief

9  on this claim.

10  **VIII.  Summary as to C 09-1572 SBA (PR)**

11       For the reasons set out above, none of Petitioner's grounds for relief has merit.

12  The petition in C 09-1572 SBA (PR) is denied.

13       **CASE NUMBER C 09-1571 SBA (PR), RESIDENTIAL ROBBERY**

14  **I.     Background**

15       On June 15, 2005, a jury convicted Petitioner of two counts of first degree

16  residential robbery while acting in concert with twins Edwin and Edmond Beloney (see

17  Cal. Penal Code § 213(a)(1)(A)).  (Ex. F at 12.)  He was sentenced to fifteen years to life

18  consecutive to one year.

19       The prosecutor asked for gang association enhancements under section

20  186.22(b)(4) of the California Penal Code, based on the Petitioner's involvement in the

21  Seven Trees street gang.  The jury found true the allegations justifying gang

22  enhancement penalties.

23       The Beloney twins and Darbey appealed.  (Resp't Ex. F at 1-2).  The Court of

24  Appeal affirmed the convictions.  (Id. at 2.)   On April 11, 2007, the California Supreme

25  Court denied review of the appellate court decision.  (Resp't Ex. H.)

26       On April 14, 2008, Petitioner filed a state habeas petition in the Santa Clara

27  County Superior Court.  (Resp't Ex. I.)  The petition was denied on April 28, 2008.

28  (Resp't Ex. J.)  On June 5, 2008, he filed a petition in the Court of Appeal.  (Resp't Ex.

1    K.)  The petition was denied on June 16, 2008.  (Resp't Ex. L.)  He then filed in the

2    California Supreme Court, on August 8, 2008.  (Resp't Ex. M.)  That petition was denied

3    on March 11, 2009.  (Resp't Ex. N.)

4         Petitioner filed his federal habeas petition in C 09-1571 SBA (PR) on April 9,

5    2009.  The Court issued an Order to Show Cause why the writ should not be granted on

6    October 28, 2009.  Respondent filed an answer to the petition on June 16, 2010, and a

7    memorandum in support of it on January 11, 2011.  Respondent also lodged the record

8    with the court.  Petitioner filed a traverse and memorandum in support thereof  on

9    September 15, 2010.  Respondent also has filed a letter brief alerting the court to a recent

10   decision from the California Supreme Court, People v. Albillar, 51 Cal. 4th 47 (2010),

11   which relates to the gang enhancement issues.

12   **II.**    **Statement of Facts**

13        The carjacking that gave rise to the petition discussed above occurred at around

14   10:50 p.m. on March 21, 2004.  (Ex. F in C 09-1572 SBA (PR) at 3.)  Darbey's second

15   petition is directed to his conviction of a residential robbery that occurred in the early

16   morning hours of the following day.

17        The California Court of Appeal summarized the evidence in its opinion on direct

18   appeal, People v. Beloney:

19        ***The Prosecution's Case***

20                          **The events of March 22, 2004**

21             Around 5:30 a.m. on March 22, 2004, Carrie Riddell and Gary
         Newell were asleep in their San Jose apartment when Riddell was
22       wakened by the sound of a loud bang. She opened her eyes and saw twins
         Edmond and Edwin running into her bedroom. Riddell tried to run but the
23       twin who was wearing a blue Pendleton shirt grabbed her and punched her
         in the stomach. When she fell to her knees he grabbed her by her hair and
24       threw her face onto the bed. At the same time, the other twin punched
         Newell and then hit him in the face with a flower pot.
25
              The twins were yelling for money or "weed." Riddell thought that
26       the twins wanted marijuana because Newell was a cannabis patient, he
         was known to have quantities of marijuana in the apartment, and he had
27       sold marijuana in the past to his friends. Newell ran into the living room
         holding a knife that he retrieved from his headboard. He was followed by
28       the twins. Newell received a laceration on his jaw from somebody hitting

him with his own machete, which had been behind the front door. When Riddell got to the living room she saw Avery standing by the front door holding Newell's machete. Defendants had broken down the locked front door in order to enter the apartment. Newell told the defendants that they had marijuana in the trunk of Riddell's car. Because she was afraid and thought that if she gave the defendants something they would leave, Riddell grabbed her key ring from a hook on the wall and gave it to Edmond.

Edmond and Avery ran out of the apartment with the keys and the machete. Edwin stood over Newell and hit him in the face with a speaker. Newell was sitting on the couch, bleeding from his face and his arms. When Riddell stood in front of Newell, Edwin put down the speaker and punched her in the face, causing a black eye. He then left.

Edmond and Avery were detained by police around 6:20 a.m. on March 22, 2004. Edmond had blood on his right thumb and on the left rear shoulder of his shirt, but he did not appear to have any wounds. Officers went to Riddell's apartment and told her that they had stopped some people and wanted her to see if she could identify them. They took her to an intersection about one-half mile away, where she identified Edmond and Avery. An officer searched Edmond and found Riddell's keys in his pocket. Edmond was wearing a gray T-shirt and blue pants. Avery was wearing a black T-shirt and blue jeans.

When Edwin was arrested, he was wearing a blue and white checkered shirt and grey jeans. Detective Laurence Ryan interviewed Edwin at approximately 9:30 a.m. on March 22, 2004. Edwin appeared to be under the influence of methamphetamine and he said that he had been using methamphetamine heavily for the previous few days. He admitted being involved in an incident at Newell and Riddell's apartment. He said that he went there to "fuck with the guy." He walked there from his mother's home, which was about three miles away. When he got there he grabbed Riddell and held her down. He said that he robbed Newell but he did not say what he had taken. Edwin said that he got the blood that was on him when he injured his leg while climbing over a fence after fleeing the apartment. Edwin acknowledged during a second interview that he is a member of the Seven Trees gang.

Officer John Mitchell interviewed Edmond at approximately 11:30 a .m. on March 22, 2004. Edmond admitted being involved in an incident at Newell's apartment. He said that it took him over one half hour to walk to the apartment from his mother's house. He had never been to the apartment before but when he went inside he heard Newell yelling, so he knew that he was in Newell's apartment. He was looking for " 'weed.' " He heard a scuffle inside the bedroom and heard Riddell, Newell's girlfriend, call out Edmond's nickname. When he entered the bedroom he saw that Newell was bleeding. Although he took Newell's machete, he did not use it on Newell. Afterwards, he threw the machete down a drain. [Footnote 4: The machete was recovered but the record is unclear as to who recovered the machete and where it was found.] Edmond admitted being a member of the Seven Trees Crips gang, but said that he had not been doing much gang activity since 2000, which was when he got "Seven Trees" tattooed on his arms. He also said that the root of the gang was a criminal street gang, but that some of the members were "'in a studio

trying to rap, too.'"

Riddell and Newell testified that they knew Edmond from when they used to "hang out" together in 2000. At that time, Edmond told them that he was a member of the Seven Trees Crips gang. Edmond had never been to Riddell's and Newell's apartment before the March 22, 2004 incident. During the March 22, 2004 incident, neither Newell nor Riddell heard any of the defendants yell "Seven Trees" or "Crips," nor did Riddell hear them threaten gang retaliation. Neither Riddell nor Newell are members of any gang.

Newell knew Edwin through Edmond. Riddell had met Edwin only once or twice, but recognized him on March 22, 2004, because he looks like Edmond. Riddell had seen Avery once before, about one month prior to the robbery. Newell knew Avery from an incident that happened a few days before March 22, 2004. At that time, Avery came to Newell's front door with several other people, some with bats and sticks. Newell recognized most of the people, knew that they were not gang members, and thought that they were there because of an earlier incident regarding a friend. Newell and two of his friends opened his front door, grabbed Avery because he was the closest to them, dragged Avery inside, slammed the door, and pushed Avery onto the couch. Although Newell testified at the preliminary hearing that a fight ensued, that Newell had "'beat his ass,'" and that Newell told Avery not to come back or there would be problems, Newell testified at trial that he could not recall what happened after he pushed Avery onto the couch.

[The court's discussion of the gang evidence is omitted here and set out in the "Sufficiency of the Evidence" section below]

### The Defense Case

Ruthie Dandridge, Edwin and Edmond's mother, testified that her sons met Avery when they were about five or six. They lived near each other and went to school and spent a lot of time together. Although she knew that her sons have "Seven Trees" tattoos, and knew what it meant, she did not know that they were in a gang.

John King, Avery's grandfather, testified that he has known Edwin and Edmond since they were six years old. They lived near his daughter Gail King, Avery's mother, and were Avery's good friends while they were growing up. The scar on Avery is actually the letters "G.K."

Jamila Carter, the mother of Edmond's two young daughters, testified that she and Edmond moved to Kansas in 1998. They returned in August 2000. She has two February 2004 misdemeanor forgery convictions. On March 22, 2004, she and Edmond were living with Edmond's mother. Edwin and Avery came over around 1:00 or 2:00 a.m., both under the influence of methamphetamine. The four of them drank and smoked marijuana and methamphetamine for a few hours. When they ran out of everything, the men left. She did not hear from Edmond again until he called her from jail.

The parties stipulated that, following their arrests on March 22, 2004, all three defendants provided blood samples to law enforcement.

1  The samples were submitted to the county crime lab for analysis and were
   found to contain methamphetamine.

2

3  (Id. at 2-11.)

   ## III.   **Statement of Issues**

4

5          Most of the issues in this case are the same as gang enhancement issues in the

6  carjacking case, discussed above.  Petitioner contends that:  (1) The evidence was

7  insufficient for the jury to find the gang enhancement beyond a reasonable doubt; (2) the

8  court failed to instruct that a relationship between the crime and the gang was required to

9  find gang enhancement to be true; (3) there was insufficient evidence of the primary

10 activities to sustain the gang enhancement sentence; (4) petitioner's due process rights

11 were violated where specific intent was established by speculative expert opinion; (5) his

12 right to effective assistance of counsel was denied where counsel failed to move to

13 bifurcate trial of the gang allegation enhancement; (6) his due process rights were

14 violated when the court refused to give a proposed pinpoint jury instruction; (7) his due

15 process rights were violated by the trial court's giving CALJIC 17.24.2; (8) counsel was

16 ineffective in failing to object to the prosecutor's purported misstatement of law

17 concerning proof of intent to benefit a gang; (9) his right to effective assistance of

18 counsel on appeal was violated by appellate counsel's abandonment of a claim that the

19 charges against Petitioner, on the one hand, and the other Beloneys, on the other, should

20 have been severed; and (10) his right to effective assistance of counsel on appeal was

21 denied where counsel failed to raise claims 1-8 on direct appeal.

   ## IV.   **Analysis**

22

23 ### A.   **Sufficiency of Evidence on Gang Enhancement (Claim 1)**

24         The Court of Appeal set out the evidence on gang involvement in the offenses:

25 ### Gang evidence

26         Officer Tamara Sass testified as an expert on African-American
   criminal street gangs. She testified that the Crips gangs came to San Jose
   from Los Angeles in 1985, settled in the Seven Trees apartment complex,

27 and claimed that turf. As the years went by, pockets of the gang settled
   elsewhere. Although the various San Jose Crips gangs use different
   names, such as Seven Trees Crips, 408 Crips, and Dark Side Mob, they

28

are one and the same gang. Members of Crips gangs identify with the color blue, but they do not always wear blue.

There are 20 validated Seven Trees Crips gang members in San Jose and 50 total members, including one in Modesto. In Officer Sass's opinion, the Seven Trees Crips is an ongoing criminal street gang, the primary activities of which are robbery, assault with a deadly weapon, witness intimidation, criminal threats, homicide, possession of drugs for sale, and carjacking. She based her opinions on the following incidents.

Peter Hodges, Marco Duncan and Shaun Thomas, who were all Seven Trees Crips gang members, pushed their way into an apartment in order to rob the victim while wearing blue clothing on December 1, 1992. One of the gang members had a gun, but the victim was able to get it away from him. The victim's girlfriend grabbed another gun and she and the victim shot at the gang members, scaring them away. On February 1, 1995, Dark Side Mob gang members put a gun to a victim's head and accused him of stealing a gun from them. The gang members, joined by defendants Edmond and Edwin, took the victim to a nearby high school. There, while Edmond held a gun on the victim, the gang members robbed the victim of $ 400. On August 12, 1997, Cedric Chambers, Kevin Mack, Johntae Hodges, and Javis Anthony, who were all Seven Trees Crips gang members, were stopped by the police for a vehicle code violation. Cedric Chambers, the driver, was under the influence of alcohol. Kevin Mack was found to possess 22 baggies of cocaine and a .22 caliber handgun. Johntae Hodges and Javis Anthony had large amounts of cash in small denominations. A blue bandana was found inside the car. A homicide occurred on August 25, 1997, in known Seven Trees gang turf. The victim was someone from out of town who came to San Jose frequently to sell drugs in that area. Johntae Hodges and Cedric Chambers shot at the victim after the victim threatened them with a pipe.

On February 19, 2000, Derrick Gaines, an admitted Seven Trees Crips gang member who has gang tattoos, and Shaun Rogers shot two victims and a bystander after not being allowed into a party. When Gaines was located at home after the shooting, a great deal of gang clothing and other gang indicia including graffiti were found in the home. Peter Hodges, an admitted Seven Trees Crips gang member, and others beat a victim at a convenience store on May 28, 2000. As they left, they yelled out "Seven Trees." On December 28, 2000, Cedric Chambers demanded $50 from a woman who he thought owed him money. When the victim refused to pay him, Chambers punched her in the face. The victim's daughter, who had previously dated another person who was there with Chambers, wanted to pay the money. The other person told the daughter to stay out of it because it was "'Seven Trees Crip business.'" The daughter paid the money and Chambers and the other person left with the money. A week and a half later, when the victim demanded that the other person return her daughter's possessions, the person threatened the victim in words the victim took to be a death threat.

On February 16, 2002, a minor reported that Richard Knight and Rodney McNary, both Seven Trees Crips gang members, went to the minor's home, where they robbed him at gunpoint, taking his jewelry and some marijuana that had been packaged for sale. The minor had "disrespected" the two gang members previously. Keyvan Dancy, a 408

Crips gang member, committed a carjacking at gunpoint with another person in Modesto on April 14, 2002. When the suspects were apprehended they were wearing blue clothing. On June 16, 2003, Tonato Mills, who admitted being a Seven Trees Crips gang member upon his arrest, assaulted an A.P.G. gang member at a high school. On September 26, 2003, Adrian Hill, an admitted Seven Trees Crips gang member, threatened to shoot a white male who had previously been affiliated with the gang, because the man wanted out of the gang. On January 18, 2004, a robbery occurred wherein the victim was approached by a black male who punched him in the face then stole his wallet and cell phone. As the black male drove away with another person, the two yelled "'Seven Trees.'" On March 28, 2004, during a car stop, Richard Knight told officers that he was a member of the Seven Trees Crips. Knight had the number seven and a tree tattooed on his stomach.

Around 10:45 p.m. on March 21, 2004, the night before the incident at Newell and Riddell's apartment, defendants Avery and Edwin, and Thomas Hall were involved in a carjacking. Two of them made the victims get on their knees, and then went through the victims' pockets. The victims thought that the suspects had guns, and one of the victims heard one of the suspects threatened to "'blow him.'" The car was stripped and dumped.

On April 10, 2004, Dante Watts, who was wearing a blue beanie and a blue jacket, told officers that he was a Seven Trees Crips. Dante Watts had "S.T." tattooed on his right arm. On April 19, 2004, Deon Watts, who was wearing a blue shirt, was photographed during a car stop flashing a Seven Trees gang hand sign, which is used by gang members to identify themselves. On May 4, 2004, Richard Knight and Deon Watts were together during a car stop. Knight told officers that he was a member of Seven Trees Crips, and Deon Watts, who was wearing a blue shirt and blue jeans, also claimed to be a member of the Seven Trees Crips. Watts had "seven" tattooed on his left arm, "trees" tattooed on his right arm, and "crip" tattooed on his lower back. On September 15, 2004, a man bragged to a friend that he had just beaten up a Seven Trees Crips gang member during a fight. Later that evening Richard Knight returned to the location of the fight with a baseball bat and several other gang members and assaulted the man. On February 8, 2005, there was a Crips gang-related assault with a deadly weapon and a brandishing incident at a high school.

Officer Sass testified that, in her opinion, Edwin is a member of the Seven Trees Crips gang. Her opinion is based on information received from other gang officers in reports and field identification cards, as well as Edwin's tattoos and admissions to officers involved in this case. Edwin has "7" tattooed on the back of his left arm, and "seven trees" tattooed on the back of his right arm. On May 18, 1998, officers responded to the report of a gang fight in known Seven Trees Crips turf in downtown San Jose. When officers contacted Edwin, he flashed them a Seven Trees Crips gang sign. Edwin was with Alvin Hill, a validated Seven Trees Crips member, and had a box cutter in his pocket. On August 24, 1998, Edwin was arrested for selling cocaine to an undercover officer in known Seven Trees gang turf in downtown San Jose. On December 8, 1998, Edwin was arrested for being drunk in public in the same area while wearing a blue Dallas Cowboys jacket and a buckle with an "S" on it, and while having Seven Trees tattoos on his arms. On March 12, 1999, Edwin was with

defendant Avery when officers found that he possessed a concealed weapon in the same known Seven Trees turf. On May 15, 1999, Edwin was again arrested for selling cocaine in same area of downtown San Jose.

Officer Sass also testified that, in her opinion, Edmond is a member of Seven Trees Crips. Her opinion is based on information from other officers, police reports and field interview cards, and Edmond's tattoos and admissions to Detective Mitchell. Edmond has a "408" tattoo on one arm, "7" tattooed on the back of his left arm, "trees" tattooed on the back of his right arm, and "7 trees" tattooed in the middle of his back. There was a Crips gang fight involving guns on April 1, 1996. During an investigation of the fight, Edmond was found in a room with several Seven Trees Crips members. On July 27, 1996, Edmond committed an assault with Andre Smith, a validated 408 Crips gang member. On January 7, 1997, Edmond was with a Crips gang member when he was found by officers to be in possession of cocaine. On March 11, 1998, Edmond was arrested for selling cocaine to an undercover officer in the same downtown San Jose area where Edwin was arrested. On August 24, 1998, the same day that Edwin was arrested for selling cocaine to an undercover officer, Edmond was seen by officers hanging out in the same area while wearing blue clothing.

Officer Sass also testified that in her opinion defendant Avery is a member of the Seven Trees Crips gang. Her opinion is based on information from other officers and in police reports and field identification cards. Avery has a "scar, almost a carving of 'B.K.'" on his left chest. Some Crips gang members call themselves B.K., which stands for Blood Killer, as Bloods gangs are rivals of Crips gangs. On April 26, 1993, Avery was wearing blue clothing when he was arrested for breaking into a car and attempting to steal its stereo in Seven Trees gang turf. On December 6, 1994, Avery committed an assault with a deadly weapon with Johnny Eagles, an admitted Crips gang member, in Seven Trees turf. On January 13, 1996, Avery was arrested for a robbery that occurred one block away from Seven Trees turf. On June 1, 1998, Avery was with Desiree Morris, a documented Crips gang member, when he was arrested in downtown San Jose in Seven Trees turf for possessing cocaine for sale. On December 20, 1998, Avery was found to be under the influence of a stimulant while wearing blue shoes in the downtown San Jose Seven Trees turf. When contacted by police in the same area on February 2, 1999, Avery had a small bat concealed under his jacket. On March 27, 1999, Avery was cited for possessing less than one ounce of marijuana in the same area. On April 18, 1999, while wearing a blue shirt, Avery assaulted three victims who accidentally bumped into him outside a nightclub in the same area. Avery admitted to San Bernardino county jail personnel on November 28, 2001, that he was a member of Seven Trees Crips in San Jose. Avery committed the carjacking with Edwin prior to the incident at Newell's apartment, and committed the robberies of Newell and Riddell with Edwin and Edmond.

Officer Sass further testified that in her opinion the robberies of Newell and Riddell were gang-related due to the admissions of membership in Seven Trees to Officer Mitchell and Lieutenant Ryan, the defendants' gang tattoos, the participation by three gang members in the robberies, the fact that the victims knew the robbers to be Seven Trees Crips gang members and specifically reported the robberies as having

1
2
3
4
5

been committed by Seven Trees Crips gang members, and the fact that the robberies occurred shortly after Newell had beaten up Avery in front of some friends. In Sass's opinion, Avery and the others went back to Newell's to save face, to retaliate, to get back the respect that was lost after the prior incident, "because when you disrespect one gang member, you disrespect the whole gang." "It's sending a message to the people that Seven Trees is not to be messed with, it helps them build their power and later to help in recruiting." In addition, any money or drugs taken would be used for the benefit of the gang.

6
7

(Ex. F at 5-11.)

8
9
10
11
12
13

In considering a sufficiency of the evidence claim on habeas, the Court considers only whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.  The Court must "view[] the evidence in the light most favorable to the prosecution," id. at 319, so must assume that the jury believed the prosecution's witnesses.

14
15
16

Detective Sass expressed her opinion that Edwin, Edmond and Petitioner are all members of the Seven Trees Crips gang and explained, with respect to each, the basis for that opinion.  She also expressed her opinion that the robberies of Newell and Riddell were gang-related.  This was sufficient evidence to support the verdict.

17
18
19
20
21
22
23
24

Petitioner contends there was no evidence to support Detective Sass' opinion "other than the hypotheticals she created herself, thus making her testimony be [sic] the result of an opinion based on speculation."  In particular, he argues, no mention was made of the gang, "of the Petitioner being beat-up earlier that day, nor was there any reference to retaliation or any mentioning of any disrespect from an earlier incident between Petitioner and the victims.  Neither the victims or the co-defendants testified or mentioned anything that would support a hypothesis or opinion that this crime was committed for any reason related to the gang."  (Traverse P. & A. at 8.)

25
26
27
28

Petitioner's contention that there was no factual evidence to support Officer Sass' testimony is incorrect.  For example, he argues there was no mention of the gang.  The victims testified, however, that they knew the robbers were Seven Trees Crips gang

members and reported the robberies as having been committed by Seven Trees Crips gang members. Petitioner wrongly contends there was no mention of Petitioner having been beaten up in an earlier incident. Newell testified about having grabbed Petitioner when he came to his apartment door, grabbed Petitioner and dragged him inside, beating him up in front of others and had told him not to return or there would be problems.

There was sufficient evidence upon which the jury could find beyond a reasonable doubt that gang enhancement allegations were true.

**B.    <u>Refusal to Instruct</u> (Claim Two)**

This issue is the same as that discussed in section VI(D) of the discussion in C 09-1572 SBA (PR), above. For the reasons set out there, this claim is without merit.

**C.    <u>Insufficient Evidence of Primary Activities</u> (Claim Three)**

Section 186.22 of the California Penal Code defines "criminal street gang" as follows:

> (f) As used in this chapter, "criminal street gang" means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity.

Petitioner claims that the criminal offenses described by Detective Sass were too remote in time and insufficiently frequent to support the conclusion that one of the Crips gang's primary activities is the commission of one or more of the crimes specified in the statute. Focusing on the word "commission," he also argues that the prosecution failed to prove the right people were arrested for the offenses the expert described, or that their conviction was not subsequently overturned, so as to justify a finding the crimes were actually committed by gang members.

There was no shortage of evidence on the subject of crimes committed by the Seven Trees Crips. Edmond admitted to Officer Mitchell "that the root of the gang was a criminal street gang." (Ex. F at 4-5.) Detective Sass testified about the Seven Trees

1    Crips' criminal acts occurring within the four years prior to the residential robbery, e.g.,

2    the February 19, 2000, shooting by Derrick Gaines (assault with a deadly weapon), the

3    December 28, 2008, assault on a woman and her daughter (robbery),  the February 16,

4    2002, robbery at a minor's home (assault with a deadly weapon, burglary), the April 14,

5    2002, carjacking, the September 26, 2003, intimidation by Adrian Hill (threat to commit

6    crimes resulting in death or great bodily injury), the January 18, 2004, robbery, and the

7    March 21, 2004, carjacking.  (Id. 7-8.)  Prior crimes she described demonstrated the

8    ongoing nature of the criminal activity since the Crips first arrived in San Jose in 1985.

9         The federal court "determines only whether, 'after viewing the evidence in the

10   light most favorable to the prosecution, any rational trier of fact could have found the

11   essential elements of the crime beyond a reasonable doubt.'"  Payne v. Borg, 982 F.2d

12   335, 338 (9th Cir. 1992) (quoting Jackson, 443 U.S. at 319).   Evidence offered in this

13   case concerning the Crips' criminal activities was sufficient to withstand a motion to

14   dismiss if one had been made by trial counsel.

15        **D.    Basis for Expert Testimony (Claim Four)**

16        This claim is the same as that raised in claim twelve of the petition in C 09-1572

17   SBA (PR).  It is discussed in section VI(A), above.  For the reasons set out there, this

18   claim is without merit.

19        **E.    Counsel's Failure to Move to Bifurcate (Claim Five)**

20        This claim is the same as that raised in claim thirteen of the petition in C 09-1572

21   SBA (PR).  It is discussed in section IV(D), above.  Although this petition involves a

22   separate crime and trial, the crucial factual points are the same as they were in the

23   carjacking case, namely that the gang evidence would have been admissible in a separate

24   trial of the substantive charges, so under California law a motion to bifurcate would not

25   have been granted.  Counsel was not ineffective in failing to make such a motion.

26        **F.    Specific Intent (Claims Six, Seven, and Eight)**

27        Petitioner contends that his due process rights were violated by the court's refusal

28   to give his requested instruction on specific intent, which informed the jury that more

United States District Court
For the Northern District of California

42

United States District Court
For the Northern District of California

1   than membership in a gang is required to prove the gang enhancement (claim six); that

2   his due process rights were violated when the court gave CALJIC 17.24.2 (claim seven);

3   and that his right to effective assistance of counsel was violated when counsel failed to

4   object to the prosecutor's misstatement of law concerning proof of intent to benefit a

5   gang (claim eight).

6          Claims six and seven were raised in C 09-1572 SBA (PR), and each raises the

7   same legal claims rejected in sections VI(F) and VI(E), above.  Claims six and seven are

8   without merit for the reasons discussed there.

9          Claim eight, that the prosecutor committed misconduct by misrepresenting the

10  law in his closing argument, involves a different closing than in the other case, but the

11  same claimed error as to the meaning of California law.  The prosecutor argued, in

12  relevant part:

13         [Y]ou don't even have to decide – does this crime benefit Seven Trees
           Crips?  Because, again, there's an aura there.  And that aura – or this is in
14         association with criminal street gang.  Why?  Because all the gang
           membership is not against the law.  Although, going out and committing
15         crimes with gang members is.

16  (Ex. F at 17.)  Petitioner asserted on appeal that the quoted portion of the prosecutor's

17  closing misstated the law.  The Court of Appeal, however, held that the closing "as a

18  whole was a correct statement of the law," and as such, there was no misconduct.  (Id. at

19  19.)

20         As noted above in the discussion of Petitioner's similar issue in the carjacking

21  case, the California courts' conclusion that the prosecutor's argument as a whole was a

22  correct statement of the law is binding on this court.  See Bradshaw v. Richey, 546 U.S.

23  at 76.  Further, the California Supreme Court has made it clear that Garcia v. Carey, 395

24  F.3d 1099 (9th Cir. 2005), relied upon by Petitioner (Traverse P. & A. at 27), does not

25  correctly state California law.  Albillar, 51 Cal. 4th at 67.  The quoted portion of the

26  closing was not misconduct.

27         Claims six through eight are without merit.

28  **G.      Assistance of Counsel on Appeal – Severance (Claim Nine)**

**United States District Court**
For the Northern District of California

1     Petitioner asserts in claim nine of his petition that his appellate counsel was

2  ineffective when she omitted from his petition for review the claim that the trial court

3  should have severed his trial from that of his codefendants.  (Pet. at 6B.)  Counsel did

4  raise this claim in the court of appeal, which rejected it (Ex. F at 21-27), but omitted it

5  from the petition for review (Ex. G).

6     There is no constitutional right to counsel for attempts to pursue discretionary

7  state appeals, such as Petitioner's petition for review of the court of appeal opinion.  See

8  Wainwright v. Torna, 455 U.S. 586, 587 (1982) (per curiam) ("Ross v. Moffitt, 417 U.S.

9  600 (1974) . . . held that a criminal defendant does not have a constitutional right to

10  counsel to pursue discretionary state appeals or applications for review in this Court.").

11  Where no constitutional right to counsel exists, there can be no claim for ineffective

12  assistance.  See Coleman v. Thompson, 501 U.S. 722, 757 (1991).  Thus, there can be no

13  claim for ineffective assistance of counsel in pursuit of discretionary state review.  Tora,

14  455 U.S. 587.

15     Because Petitioner had no right to effective assistance in his petition for review,

16  this claim cannot be the basis for federal habeas relief.

17  **H.**     **Ineffective Assistance of Counsel on Appeal – Failure to Raise Claims Presented Here (Claim Ten)**

18     Petitioner contends he was denied effective assistance of counsel by appellate

19  counsel's failure to raise claims one through eight on direct appeal.  Claims one through

20  eight, which Petitioner contends should have been raised on appeal, are without merit for

21  the reasons discussed above.  Therefore, Petitioner has failed to show counsels'

22  performance fell outside the bounds of reasonable professional assistance or that he

23  suffered actual prejudice as a result of counsel's failure to raise these claims.

24  **V.**     **Summary as to C 09-1571 SBA (PR)**

25     For the reasons set out above, none of Petitioner's grounds for relief has merit.

26  The petition in C 09-1571 SBA (PR) is denied.

27

28

44

**United States District Court**
For the Northern District of California

1

## CONCLUSION

2    For the foregoing reasons, the petitions for writs of habeas corpus are DENIED.

3    Furthermore, no certificate of appealability is warranted in this case.  See Rule

4 11(a) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (requiring district

5 court to rule on certificate of appealability in same order that denies petition).  Petitioner

6 has failed to make a substantial showing that a reasonable jurist would find this Court's

7 denial of his claims debatable or wrong.  See Slack v. McDaniel, 529 U.S. 473, 484

8 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this

9 Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal

10 Rules of Appellate Procedure.  See Rule 11(a) of the Rules Governing Section 2254

11 Cases.

12    The Clerk of the Court shall enter judgment and close the file.

13    IT IS SO ORDERED.

14

15 DATED:  9/28/12

16
SAUNDRA BROWN ARMSTRONG
United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

1  UNITED STATES DISTRICT COURT
   FOR THE
2  NORTHERN DISTRICT OF CALIFORNIA

3

4  AVERY DARBEY,                          Case Number: CV09-01571 SBA

           Plaintiff,
5                                         **CERTIFICATE OF SERVICE**

6     v.

7  JAMES WALKER et al,

           Defendant.
8  _____/

9

10 I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S.
   District Court, Northern District of California.

11 That on October 15, 2012, I SERVED a true and correct copy(ies) of the attached, by
   placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter
12 listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an
   inter-office delivery receptacle located in the Clerk's office.

13

14

15 Avery M. Darbey T-39009
   Salinas Valley State Prison
16 C-Facility #215
   P.O. Box 1050
17 Soledad, CA 93960-1060

18
   Dated: October 15, 2012
19
                                          Richard W. Wieking, Clerk
20                                        By: Lisa Clark, Deputy Clerk

21

22

23

24

25
   G:\SBALC2\Keith\Prisoner\DARBEY1571-72.deny-gaw2.wpd
26

27

28

46